IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 09-cv-00970-PAB-KMT

PREDATOR INTERNATIONAL, INC., a Colorado corporation,

Plaintiff,

v.

GAMO OUTDOOR USA, INC., a Florida corporation,

Defendant.

_____

**ORDER DENYING PRELIMINARY INJUNCTION**
_____

This matter comes before the Court on a motion for preliminary injunction

[Docket No. 9] filed by plaintiff Predator International, Inc ("Predator") in its action

against defendant Gamo Outdoor USA, Inc. ("Gamo"). For the reasons detailed below,[1]

the Court denies the motion for preliminary injunction on the trade dress claim.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Predator has manufactured, distributed, and sold "Polymer Ballistic Airgun

Pellets" since 2002. Pl.'s Mot. for a Prel. Inj. [Docket No. 9] ("Pl.'s Mot."), ex. 21

("Cogswell Decl.") ¶ 4. It has held a patent for Polymer Ballistic Tip Pellets since March

_____

[1]As required by Fed. R. Civ. P. 52(a)(2), I have stated, *infra*, "the findings and
conclusions that support" my order. *See Prairie Band of Potawatomi Indians v. Pierce*,
253 F.3d 1234, 1245 (10th Cir. 2001) ("Under Rule 52(a), a district court is required to
make findings of fact and conclusions of law at the time it enters a preliminary
injunction."). It is worth noting that "the findings of fact and conclusions of law made by
a court granting a preliminary injunction are not binding at trial on the merits." *Univ. of
Texas v. Camenisch*, 451 U.S. 390, 395 (1981). What follows, in other words, are "my
preliminary findings of fact and conclusions of law," and "[o]bviously the findings and
conclusions may be different after a trial on the merits." *Hartford House Ltd. v. Hallmark
Cards Inc.*, 647 F. Supp. 1533, 1536 (D. Colo. 1986).

4, 2003.  Pl.'s Mot. ex. 1 ("'893 Patent").  Since 2007, Predator has sold these airgun pellets under the trademark POLYMAG.  *Id.*  POLYMAG pellets have a red polymer tip, which Predator, for purposes of this motion, has termed the "POLYMAG trade dress." *Id.* ¶ 5.  The POLYMAG was the only airgun pellet with a red polymer tip before Gamo introduced its Red Fire pellet.[2]  *Id.* ¶ 5.

Gamo issued a press release on November 13, 2008 announcing the introduction of its Red Fire airgun pellet.  Def.'s Response to Mot. for Prelim. Inj. [Docket No. 39] ("Def.'s Response"), ex. AA ("Abrams Decl.") ¶ 12.  Gamo then displayed the pellet in January 2009 at an event called the Annual SHOT Show.  *Id.* Gamo declares that its first shipment of Red Fire pellets went out on March 12, 2009 and, from that date until the end of June 2009, the pellets have had gross sales of $39,996.  *Id.* ¶¶ 13,14.

Predator's website describes the POLYMAG as offering the following benefits:

> Experience better accuracy, deeper penetration and higher velocity with Predator's revolutionary new hunting Polymags™ (polymer tip pellet).  Hollow point design creates instant expansion on impact allowing for the taking of larger animals.  Hard polymer tip provides excellent flight characteristics.

Pl.'s Mot. ex. 2.  The website also includes the following description:

> The Predator Polymag™ (polymer tip pellet) features a traditional hollow point design in a standard airgun application.  The aerodynamic shape and hard polymer tip provide excellent flight characteristics. Other features include:
> - Higher Velocity & Flat Trajectory
> - Very Accurate and Efficient
> - Allows for Deeper Penetration

---

[2]Gamo does not contest this fact, though it has offered evidence of pre-existing red-tipped firearm ammunition.

- Instant Expansion on Impact
- Light Weight (.177 cal weighs 8gr, .22 weighs 16 gr)

*Id.*  Gamo used largely the same language to describe its Red Fire pellets when announcing them in the initial press release, Pl.'s Mot. ex. 8, on its website, *id.* ex. 11, and on Red Fire packaging.  Def.'s Hr'g ex. A-32.[3]  Gamo has since removed this language from its website.

The Predator and Gamo pellets are both shaped similarly and have red tips. Pl.'s Reply [Docket No. 40], ex. 37 (sample pellets).  If looked at side-by-side, the tips are of a slightly different tone.  *See id.*  When magnified, the differences in the size and shape of the pellet, including the tip, become more apparent. *See* Def.'s Hr'g ex. A-23.

Customers of the POLYMAG pellets have commented online about the quality of the pellets, which have received a rating of five stars out of five on the Bass Pro Shop online reviews page – and the nature of their appearance; a few individuals have referenced the red tip. Pl.'s Reply ex. 31*,* at  6,7,11,13,22,42,45 (customers commenting that they look "really cool," "good," "wicked if nothing else," and "awesome," and that the "red tips fall off," that there is a "red polymer tip," and the "shape and red tip are interesting compared to most other pellets.").  The POLYMAG pellets also have received positive reviews from trade presses for their accuracy and overall quality.  Pl.'s Mot. ex. 7.

---

[3]Although the parties have filed a stipulation on the copyright issue [Docket No. 32], there are indications that Red Fire pellets in packaging containing Predator language still appear in and are being shipped to stores. *See* Mot. for Contempt and to Enforce Stip. Inj. [Docket No. 64]; Moskovitz Decl. [Docket 65], ex. A.

3

Predator packages its POLYMAG pellets in a round metal tin.  Def.'s Hr'g exs. A-34, A-35.  The tin for the .177 caliber POLYMAG is two inches in diameter and just over three quarters of an inch in height.  *Id.* ex. A-35.  The tin containing .22 caliber pellets is a little over two and a half inches in diameter and also just over three quarters of an inch in height.  *Id.* ex. A-34. The tops of both tins are covered with a black, white, and red label, which has a depiction of the red tipped pellet, with black taking up about three quarters of the label's surface.  *Id.* exs. A-34, A-35.[4]

Gamo's packaging for its Red Fire pellets, which are .177 caliber, includes a metal tin with a clear plastic top which allows potential customers to view the pellets.  *Id.* ex. A-31.  The tin is a disc two and a half inches in diameter and a half inch in height.  *Id.*  The tin is contained in plastic and cardboard packaging; the cardboard includes the Red Fire and Gamo names.  Def.'s Response, ex. B.  The front of the cardboard packaging, like POLYMAG's, is also predominately black, with red and white lettering.  *Id.*  Moreover, the pellet is depicted with a trail of flames.  *Id.*  The back of the cardboard packaging repeats the trade names and the pellet depiction, but also includes a depiction of an open tin full of pellets with a few pellets lying next to the tin.  *Id.*  On the back of the packaging, the pellets are described using virtually the same language Predator used to describe its product on its website and in its brochures.  *Id.*

Over the last three years, Predator has marketed its POLYMAG through its website and distribution of approximately 1,000 brochures at the SHOT Show, a gun

---

[4]Before the initiation of the name POLYMAG, Predator's metal tin for .22 caliber pellets was the same size, but was predominately white, with green, red, and black words and coloring.  Def.'s Hr'g ex. A-33.  The depiction of the pellet, with its red tip, was larger.  *Id.*

and ammunition trade show.  Cogswell Decl. ¶ 11.  Predator declares that it has spent

over $23,000 to market and advertise the POLYMAG.  *Id.* ¶ 13.  In addition to the

website and brochures, Predator has rented a booth at the SHOT Show and placed a

rolling advertisement in the Predator Xtreme Magazine since 2004, which has a

circulation of approximately 115,000.  *See id.*; Pl.'s Mot. exs. 5,6.  The record also

includes articles from trade magazines about the POLYMAG.  *See* Pl.'s Mot. ex. 7.  The

color of the pellet's tip is depicted in a few places within these magazines and

referenced in the text of at least one.  *Id.*

The POLYMAG pellets are sold by various sporting good retailers.  Pl.'s Mot. at

6.  A tin containing 200 pellets sells for either $15.99 or $16.99, depending on the

caliber. *Id.*; Cogswell Decl. ¶ 15.  Predator avers that it had gross sales of the pellets

approaching $900,000 since their introduction in 2002, with significant sales growth in

the last three years resulting in $365,000 in sales in 2008,[5]  Cogswell Decl. ¶ 16,

$302,814 of which were on account of POLYMAG sales.  Def.'s Response, ex. Y

("Cogswell Dep."), at 73.  Between January 1, 2009 and July 14, 2009, POLYMAG

sales totaled $143,429.  Overall, POLYMAG sales are down from last year. Cogswell

Decl. ¶ 16 (claiming an approximate 11% dip as of May of this year).  Determining

precisely how much is unnecessary in deciding this motion.  As for Gamo, between

March 12, 2009 and June 30, 2009, it has sold $39,996 worth of Red Fire pellets.

There is evidence in the record supporting a finding that certain individuals

associate the red tip with POLYMAG and that at least some customers of one online

---

[5]At the hearing, there was testimony to the effect that the airgun pellet market in 2008 was approximately $12.5 million.

5

supplier have asked for the pellet with the red-tip. Pl.'s Mot. exs. 17,18,19.  After the release of Red Fire pellets, discussion of the two red-tipped pellets appeared online. A few comments referenced the similarity of the two products and the copying of Predator's marketing language by Gamo.  Pl.'s Mot. ex 16.[6]  For example, at least one customer believed initially that the Red Fire pellets were Predator pellets, writing that if they were Predator products, "it would explain not only the look, but the grains matching along with the wording in the ad copy."  *Id.*[7]  Thirty four minutes after posting that speculation, however, another participant in the forum wrote to clarify that they were not Predator products. *Id.*

Furthermore, a Predator customer called Predator in October 2008, before the issuance of Gamo's Red Fire press release, and asked if Predator had been sold to Gamo.  Pl.'s Mot. ex. 20 ("Dixon Decl.") ¶ 2.  The customer had seen a close-up of the new Gamo product on a hunting television show and believed it to be a POLYMAG.  *Id.* Another customer saw Red Fire pellets on Gamo's website and thought Gamo had become a POLYMAG distributor, while a third customer thought the same thing after seeing the Red Fire booth at the SHOT Show.  Pl.'s Mot. exs. 17 ¶2 & 18 ¶ 3.

Predator contacted Gamo after the November 2009 press release to express its belief that the Red Fire pellets appeared to infringe the '893 Patent and to be a copy of

---

[6]The testimony of at least two of the online forum participants may appear elsewhere in the record, as they indicate having submitted affidavits to Predator's counsel.   *See* Pl's Mot. ex. 16.

[7]*See* Pl.'s Reply ex. 32 (another online forum discussion) ("I saw in a recent e-mail flyer . . . that GAMO is now selling what appears to be a rebadged Predator."; "I was thinking the same thing."; "[The Gamo pellets] look just like Predators as best I could see.").

Predator's product. Cogswell Decl. ¶ 14.[8]  Gamo denied infringing the patent and

copying the POLYMAG, and sent an engineering drawing of the Red Fire in response to

Predator's request for a sample of the pellet. *Id.*  As mentioned above, Gamo then

showed, but did not sell, the Red Fire at the January 2009 SHOT Show.  *Id.* ¶ 15.  On

March 12, 2009, Gamo began selling Red Fire pellets. Abrams Decl. ¶ 13.

On April 28, 2009, Predator filed a complaint in this Court, which it then

amended on May 6, 2009,[9] asserting copyright, patent, and trade dress claims, as well

as state statutory and common law claims.  Predator's motion for a preliminary

injunction followed on May 15, 2009.  The motion has been fully briefed and a hearing

was held on July 22, 2009.  The parties have agreed to limit the resolution of this

motion to Predator's trade dress claim.[10]

## II.  ANALYSIS

### A.  Preliminary Injunction Standard of Review

In order to obtain a preliminary injunction, the moving party bears the burden of

establishing that four factors weigh in its favor: (1) a likelihood of success on the merits;

(2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary

relief; (3) that the balance of equities tips in the movant's favor; and (4) that the

---

[8]Certain paragraph numbers in the Cogswell Declaration repeat.  For example, there is more than one paragraph number 14.

[9]Predator sought leave to file a second amended complaint on September 16, 2009 to add Industrias El Gamo, S.A. as a defendant [Docket No. 62].  The motion for leave to file the second amended complaint was granted on October 20, 2009.

[10]The parties have stipulated to the granting of a preliminary injunction on Predator's copyright claim. Stipulated Prel. Inj. [Docket 32].

injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Resource Defense Council, Inc.*, --- U.S. ----, 129 S. Ct. 365, 374 (2008)). The Tenth Circuit has made it clear that "because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)) (internal quotation marks omitted). Consequently, granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir. 1989), "is the exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

"[T]he limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *See Schrier v. University of Colorado*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)) (internal quotation marks omitted). As such, there are three types of particularly disfavored preliminary injunctions: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009) (citing *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc), *aff'd on other grounds*, 546 U.S. 418 (2006)). Before a court grants relief under one of these three types of preliminary

injunctions, a movant seeking such an injunction must make a heightened showing of the four factors. *RoDa Drilling*, 552 F.3d at 1209; *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1177 (10th Cir. 2003).

Gamo claims that a preliminary injunction in this case will alter the status quo and, accordingly, that plaintiff must make a heightened showing on each of the preliminary injunction requirements. Def.'s Response at 6. I disagree. The status quo is "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *SCFC ILC, Inc.,* 936 F.2d at 1100 n.8; *see Schrier*, 427 F.3d at 1260; *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001) ("In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights."). The "last uncontested status between" Predator and Gamo was prior to Gamo's initiation of the sale of Red Fire airgun pellets. See *supra* Section I. Indeed, Predator began raising its concerns to Gamo long before the first sales of Red Fire pellets. A preliminary injunction preventing Gamo from selling Red Fire pellets would not disrupt the "status quo." Therefore, Predator need not make a heightened showing on the preliminary injunction requirements.

_____Furthermore, Predator is not entitled to a more lenient likelihood of success standard. The Tenth Circuit has stated that, "where the moving party has established the three 'harm' factors tip *decidedly* in its favor, the 'probability of success requirement' is somewhat relaxed." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (emphasis in original) (citing *Prairie Band of Potawatomi Indians v. Pierce*,

253 F.3d 1234, 1246 (10th Cir. 2001)).  To establish likelihood of success on the merits in such instances, "[t]he movant need only show 'questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation.'" *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1199 (10th Cir. 1992) (citations omitted).

In *Winter v. Natural Res. Def. Council, Inc.*, --- U.S. ----, 129 S. Ct. 365 (2008), however, the Supreme Court held that a more lenient irreparable harm standard in cases where a plaintiff has shown a "strong likelihood of prevailing on the merits" is "inconsistent with [its] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 375-76.  The Court did not address whether a "somewhat relaxed" likelihood of success standard is permissible when the harm factors weigh decidedly in movant's favor.  However, "[o]n its face, *Winter* appears to require a 'likel[ihood]' of success on the merits."  *Incantalupo v. Lawrence Union Free School Dist. No. 15*, --- F. Supp. 2d ----, 2009 WL 2766705, at *5 (E.D.N.Y. Aug. 24, 2009); *see International Business Machines Corp. v. Johnson*, 629 F. Supp. 2d 321, 334-35 (S.D.N.Y. 2009) ("The Court pauses to note that at least one authority has read the Supreme Court's recent decision in *Winter* [] as casting doubt on Second Circuit case law allowing parties who cannot show a likelihood of success to obtain an injunction if they show that there are 'questions so serious, substantial, difficult, and doubtful as to make them fair ground for litigation.'") (citing 13 James Wm. Moore et al., *Moore's Federal Practice* § 65.22[5] [c] (3d ed. 2009)).  "Notwithstanding the Supreme Court's decision in *Winter* . .

10

. the Second Circuit has continued to allow parties to obtain a preliminary injunction either through : (1) 'a likelihood of success on the merits'; or (2) 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.'" *Incantalupo*, 2009 WL 2766705, at *5 (citations omitted).  The Tenth Circuit, which derived its modified likelihood of success approach from the Second Circuit, has also cited *Winter* without addressing its potential impact on the modified approach. *See RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1209, n.3 (10th Cir. 2009); *San Luis Valley Ecosystem Council v. U.S. Fish and Wildlife Service*, --- F. Supp. 2d ----, 2009 WL 2868818, at *4 n.1 (D. Colo. Sep. 3, 2009 ("[T]he Tenth Circuit appears to recognize the continuing validity of the modified success-on-the-merits formula notwithstanding the *Winter* decision.") (citing *RoDa Drilling*).

In this case, for the reasons discussed below, I need not determine whether the Tenth Circuit's "modified" approach has been called into question by *Winter*.  Predator has neither demonstrated a "likelihood of success on the merits" nor raised "questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation," having failed to meet the first requirement of a trade dress claim.

### B.   Plaintiff's Trade Dress Claim

Section 43(a) of the Lanham Act provides a federal cause of action for trade dress infringement.  *See* 15 U.S.C. § 1125(a).  Trade dress includes a product's "overall image and appearance, and may include features such as size, shape, color or color combinations, texture, graphics, and even particular sales techniques."  *Sally Beauty*

*Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 977 (10th Cir. 2002) (citation omitted). "Under § 43(a) of the Lanham Act, a plaintiff has a cause of action against any person whose use of a word, symbol or device is likely to cause confusion regarding the source or origin of the plaintiff's goods." *Id.* (citing 15 U.S.C. § 1125(a)(1)(A); *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000)).

First, I must determine how Predator has defined its trade dress.[11]  Predator references multiple forms of copying when asserting its trade dress argument. *See* Pl.'s Mot. and Br. at 1 ("This is a blatant case of copying — copying on so many levels that Gamo's ill intent could not be more obvious."); Pl.'s Reply at 1 ("Gamo intentionally copied the Polymag, in multiple ways, including its distinctive red tip.").  Predator alleges the multi-faceted nature of the copying, however, for purposes of providing a foundation for its patent and copyright claims.  For example, Predator argues that "Gamo has copied Predator's product, distinctive red-colored tip, and product descriptive *word for word*."  Pl.'s Mot. and Br. at 16 (emphasis in original).  But plaintiff has isolated the copying of the red-colored tip as the basis of its trade dress claim.  *See id.* (arguing that "Gamo's copying of Predator's trade dress is only one part of Gamo's scheme to copy Predator across the board" before going on to assert that  the "red-colored tip has obtained secondary meaning").  Predator does not contend that the trade dress is the combined effect of the tip's shape and color in conjunction with the shape and size of the pellet at issue.  *See* Am. Compl. [Docket No. 4] ¶ 23 ("The

---

[11]*See Hammerton, Inc. v. Heisterman*, No. 2:06-CV-00806TS, 2008 WL 2004327, at *3 (D. Utah May 9, 2008) ("The 'focus on the overall look of a product . . . does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress.'") (citation omitted).

POLYMAG features a distinctive, nonfunctional red colored tip that is well known to consumers and has become associated with Predator and the POLYMAG.  This red tip will hereinafter be referred to as the "POLYMAG trade dress."); Pl.'s Reply at 7 n.9 ("Notably, any reference to the look of the Polymag primarily concerns the red colored tip because the design of the body of the pellet is not all that uncommon.").  Indeed, Predator essentially concedes that, for purposes of its trade dress claim, if the tips of Gamo's pellets were a different color, there would be no infringement.  *See* Pl.'s Reply at 6 ("[A] photo of from the 2009 Shot Show of Gamo's display of the Red Fire shows the pellet with red, blue, and yellow tips.  This is proof that Gamo could have used, and in fact considered, other colors besides red.") (citations and footnote omitted).[12]

In other words, Predator's assertions regarding other forms of copying are meant to substantiate Gamo's overall intent, which is certainly relevant to the trade dress analysis, *see infra*, but is not part of plaintiff's definition of its allegedly infringed trade dress.  It is clear from Predator's complaint, briefing and arguments during the hearing that the trade dress claim here turns on whether the use of a *red* polymer tip by Gamo on its Red Fire pellets infringed their trade dress. Therefore, when assessing the likelihood of success of plaintiff's trade dress claim, I will focus upon the trade dress as plaintiff has defined it for its own product. *See Vornado Air Circulation Sys. v. Duracraft Corp.*, 58 F.3d 1498, 1502 (10th Cir. 1995) ("[T]rade dress analysis may be applied to a single feature or a combination of features."); 1 *McCarthy on Trademarks and Unfair Competition* ("*McCarthy on Trademarks*") § 8:1, 8:3 (4th ed.) ("While trade dress is most

---

[12]In fact, Gamo does produce an airgun pellet with a black pointed tip.  *See* Pl.'s Ex. 45 (containing a depiction of Gamo's "Tomahawk" pellet).

often defined as a totality of elements, there is no reason why the plaintiff cannot define a list of elements consisting of less than the totality of features appearing on a package or container.").

To ultimately succeed on its claim that Gamo is infringing its trade dress, plaintiff must show: "(1) The trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) There is a likelihood of confusion among consumers as to the source of the competing products; and (3) The trade dress is nonfunctional." *General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1227 (10th Cir. 2007) (citations omitted); *see* 15 U.S.C. § 1125(a).

### 1. Secondary Meaning

The Supreme Court held in *Wal-Mart* "that design, like color, is not inherently distinctive." 529 U.S. at 212. As one treatise put it, the "Court felt that the competitive playing field of product innovators and copying competitors was tilting in favor of product innovators." 1 *McCarthy on Trademarks* § 8:12.50 (discussing *Wal-Mart*). The *Wal-Mart* Court reasoned that:

> Competition is deterred . . . not merely by successful suit but by the plausible threat of successful suit, and given the unlikelihood of inherently source-identifying design, the game of allowing suit based upon alleged inherent distinctiveness seems to us not worth the candle. That is especially so since the producer can ordinarily obtain protection for a design that *is* inherently source identifying (if any such exists), but that does not yet have secondary meaning, by securing a design patent or a copyright for the design – as, indeed, respondent did for certain elements of the designs in this case. The availability of these other protections greatly reduces any harm to the producer that might ensue from our conclusion that a product design cannot be protected under § 43(a) without a showing of secondary meaning.

529 U.S. at 214.  In short, "with respect to . . . colors . . . no mark can ever be inherently distinctive," *Wal-Mart*, 529 U.S. at 211 (citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162-63 (1995)).

Therefore, although Predator may have obtained patent and copyright protection of aspects of its product's design and marketing materials,[13] it still must show that the color of its Polymag pellet tips has "become distinctive through secondary meaning." *General Motors*, 500 F.3d at 1227; *Wal-Mart*, 529 U.S. at 212 ("We held that a color could be protected as a trademark, but only upon a showing of secondary meaning."). "[O]ver time, customers may come to treat a particular color on a product or its packaging . . . as signifying a brand." *Qualitex*, 514 U.S. at 163.  Customers, however, need not be able to identify the name of the brand, only that they are "aware that the product comes from a single, though anonymous, source." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 940 (10th Cir. 1983).  For the reasons stated below, I find that the red color of the POLYMAG tip does not "proclaim its identity of source and quality" but rather, at most, "serve[s] simply to stimulate further enquiry about it." 1 *McCarthy on Trademarks* § 15:11.

The Tenth Circuit "has explained . . . that '[t]o acquire secondary meaning, a descriptive mark must have been used so long and so *exclusively* by one producer with reference to his goods' that it has acquired distinctiveness." *Sally Beauty*, 304 F.3d at

---

[13]"Unlike patent and copyright law, trade dress law does not exist as a reward for innovation or creativity. As the Supreme Court observed: 'The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity.' Rather, trade dress protection exists only if it can be proven that the trade dress identifies and distinguishes the plaintiff as source." 1 *McCarthy on Trademarks* § 8:1 (footnotes omitted).

978 n.4 (quoting *J.M. Huber Corp. v. Lowery Wellheads, Inc.,* 778 F.2d 1467, 1470

(10th Cir.1985)) (emphasis in original); *see In re Owens Corning Fiberglas Corp.*, 774

F.2d 1116, 1125 (Fed. Cir. 1985) (considering, among other factors, the exclusive use

of the color pink since 1956).   While the record does show that Predator was the only

producer of red-tipped airgun pellets, satisfying the exclusivity requirement, the use for

seven years is insufficient to establish secondary meaning absent additional evidence

demonstrating that it has become a source identifier.[14] *Cf. Winning Ways, Inc. v.*

*Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1471 (D. Kan. 1996) (finding that four

years of use of a jacket's design "has some significance" but "[b]ecause plaintiff has not

advertised its jacket in any significant amount or manner . . . a longer period is

necessary to achieve secondary meaning").[15]   Finding otherwise would mean that

product innovators, simply because they came first, could prevent competitors from

---

[14]Predator emphasizes that the "POLYMAG has been the only airgun pellet on the market with a distinctive red colored tip" and contends that its seven years of use leads to a "presumption that the red tip has become distinctive in the minds of consumers." Pl.'s Mot. and Br. at 18 (citing 15 U.S.C. § 1052(f)).  The Lanham Act states that the "Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made." 15 U.S.C. § 1052(f).  The long and exclusive use of a trade dress can certainly serve as evidence of secondary meaning.  But length of use is not dispositive. *See* 2 *McCarthy on Trademarks* § 15:62 (commenting that a "statement of use for at least five years is not generally accepted when an applicant seeks to register trade dress such as product shape, because an applicant faces a heavy burden of proof in such a case"). In any event, the prima facie showing made by the seven years of use has been overcome by other evidence of record.

[15]*See Winning Ways*, 913 F. Supp. at 1471 ("Further, the trade dress that Winning Ways seeks to protect is the jackets themselves, not, for example, the names of the jackets.  By word of mouth, a name can achieve secondary meaning.  The overall look of each jacket must be viewed before secondary meaning can attach.").

later copying non-product identifying features without having first to demonstrate the acquisition of secondary meaning.  In short, while exclusive use of the red-colored tip on airgun pellets "is a strong factor in favor of secondary meaning," *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir. 1995), it is insufficient on its own when weighed against the other factors I must consider when determining whether secondary meaning has been achieved.  *See* 2 *McCarthy on Trademarks* § 15:62 ("Secondary meaning may be acquired in much less than five years or it may never be acquired, no matter how long the period of use.").

In *Owens-Corning*, the Federal Circuit concluded that the color pink, having achieved distinctiveness through secondary meaning, could be registered as a trademark for Owens-Corning insulation.  *In re Owens Corning Fiberglas Corp.*, 774 F.2d 1116 (Fed. Cir. 1985).  In reaching that conclusion, the court relied in part on not only the extensiveness of the product advertisements (over $42,000,000) but its focus on the "pinkness" of the product.  *See, e.g.*, *id*. at 1126-27 ("Applicant's submissions show the use of slogans in its advertising, e.g.*, 'Pink of Perfection'; 'The Pink Cooler'; 'Big Pink'; 'Love that Pink'; 'Pink Power'; 'America's Favorite Pink Product'; 'Tickled Pink'; 'Put your House in the Pink'; 'Up with Pink'; 'Prime Time Pink'; 'Think Pink'; 'Think More Pink'; 'Beat the Cold with Pink'; 'All that Pink'; and 'Plant Some Pink Insulation in your Attic'").

Predator points to its advertising efforts and coverage of its product in trade presses as supporting secondary meaning.  Predator has provided the court with advertisements and media coverage which picture the alleged trade dress and mention

the red tip.  There is no evidence, however, that the advertising and coverage were aimed at the trade dress and its source identification qualities. *See Art Attacks Ink, LLC v. MGA Entertainment Inc.*, --- F.3d ----, 2009 WL 2950659, at *6 (9th Cir. Sep. 16, 2009) ("To demonstrate secondary meaning based on advertising, the advertising must be of a 'nature and extent to create an association' with the advertiser's goods."); *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 44 (1st Cir. 2001) (affirming the district court's finding that the "advertising did not emphasize any particular element of its trade dress, and thus could not be probative of secondary meaning); *Winning Ways*, 913 F. Supp. at 1470 ("Given the Tenth Circuit's definition of secondary meaning in *Vornado* . . . this court concludes that '[t]he critical question in considering the evidence is not the extent of the promotional efforts but their effectiveness in creating an association' between the trade dress and plaintiff") (citation omitted); *see also Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662 (7th Cir. 1995) ("Advertising that touts a product feature for its desirable qualities and not primarily as a way to distinguish the producer's brand is not only not evidence that the feature has acquired secondary meaning, it directly undermines such a finding."). Predator cites the coverage of the POLYMAG in *Varmint Hunter* magazine which included a reference to its "red polymer tip."  Pl.'s Mot. and Br. at 19.  The article, however, proceeded to distinguish the pellet from others based on its functional capacity. *See* Pl.'s Mot. and Br. ex. 7 ("This sounds like another pointed pellet, but there is one significant difference.  The Predator gives near target accuracy in most airguns that I have used them in.  It is not just a clever design, it is a clever design that

18

performs extremely well.")  *Cf.* 1 *McCarthy on Trademarks* § 8:8 ("[A]dvertising which promotes the functional features of the trade dress or which fails to promote an association between product and source does not support a finding of secondary meaning.  Similarly, secondary meaning cannot usually be proven by advertising that merely pictures the claimed trade dress and does nothing to emphasize it or call attention to it.") (footnotes omitted).  I conclude that this evidence of advertising and media coverages does not indicate that the red tip has acquired secondary meaning.[16]

Evidence of intentional copying also may be considered when assessing whether a product has achieved secondary meaning. *Sally Beauty*, 304 F.3d at 978.  Gamo's Red Fire is certainly similar in appearance to the POLYMAG due in large part to its red polymer tip.  That similarity, along with the copied language from the packaging and website, is evidence of Gamo's intent to copy Predator's product.[17]  Predator would like this court to find that similarity sufficient, on its own, to establish secondary meaning, citing *Marker Int'l v. DeBruler*, 844 F.2d 763 (10th Cir. 1988), for the proposition that "proof of defendant's intentional copying of plaintiff's trademark was *alone* sufficient to

---

[16]Predator also cites $900,000 of sales since 2002.  Pl.'s Mot. and Br. at 18; Cogswell Decl. ¶ 16.  Sales figures may be indicative of secondary meaning if joined with other evidence that establishes the trade dress has become a source identifier. *Sally Beauty*, 304 F.3d at 978.  However, "[s]tanding alone, sales volume may not be indicative of secondary meaning because it could be related to factors other than source identification." *Id.*

[17]Gamo claims that it chose the red tip, *inter alia*, to incorporate one of its company colors into the product and to capitalize on red's associations with aggressiveness and hunting. *See* Def.'s Response at 3.  I find these contentions unpersuasive and conclude that Gamo copied the POLYMAG's red tip.  For the reasons stated in the text above, however, that does not on its own establish that the tip has achieved secondary meaning.

establish secondary meaning." Pl.'s Mot. and Br. at 17 (emphasis in original).  In *Marker Int'l*, however, the defendant "stated that he continued to use [the disputed mark] because [plaintiff] had a reputation for quality products and he believed people might associate that reputation with" defendant's products.  844 F.2d at 764.  The *Marker* court deemed this an admission by defendant that plaintiff's mark had achieved secondary meaning.  *Id.* The *reason* for copying was critical to the court's decision.  The copying alone did not constitute an admission of secondary meaning. *Id.*; *see Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1486 (10th Cir. 1987) (refusing to find that an "inference of a likelihood of confusion" was raised where the intent was to parody rather than to confuse the public); *Winning Ways*, 913 F. Supp. at 1472 ("The court finds as a factual determination that Holloway copied the Clipper and Victory to take advantage of those jackets' popular styles and not their source identification."). *Cf. Hartford House Ltd. v. Hallmark Cards Inc.*, 647 F. Supp. 1533, 1542 (D. Colo. 1986) ("[A] finding of intent to copy *and 'cash in' on the plaintiffs' reputation* and goodwill may, standing alone, justify a finding of likelihood of confusion") (emphasis added).  If copying alone were sufficient to establish secondary meaning, then all product features that might attract copying by competitors would achieve secondary meaning upon the first instance of such copying.  That would gut "secondary meaning" of any substance, replacing it with a rule that the first person to market a feature may prevent others from incorporating the feature into their products. *Cf. Wal-Mart*, 529 U.S. at 214.

Here, the record does not establish that the tip was copied in order to capitalize on an established secondary meaning.   Rather, the red tip's primary significance

appears to be aesthetic. *Cf. TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001) (commenting on its prior "caution against misuse or overextention of trade dress," quoting *Wal-Mart*, 529 U.S. at 213, where the Court noted that "product design almost invariably serves purposes other than source identification").[18]  Predator argues that "the spontaneous, unsolicited consumer reaction to the *look* of the Polymag, supports secondary meaning." Pl.'s Reply at 7.  Some examples include comments that the pellets look "really cool," "good," "wicked if nothing else," and "awesome," and that the "red tips fall off," that there is a "red polymer tip," and the "shape and red tip are interesting compared to most other pellets." *Id.* (citing Pl.'s Mot. ex. 31 at 6,7,11,13,22,42,45).[19]  That the tips look "cool" and that the shape and red tip combined might be "interesting" to consumers does not establish that the red tip has achieved secondary meaning as a source identifier.  Instead, it appears that the red tip has an aesthetic quality, one which competitors, in the absence of secondary meaning, are free to copy.  *Cf. Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1363 (7th Cir. 1995) (in addressing the likelihood of confusion, concludes that defendant's desire to sell a

---

[18]"In the case of product design, as in the case of color," we think consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs . . . is intended not to identify the source, but to render the product itself more useful or more appealing." *Wal-Mart*, 529 U.S. at 213.

[19]Predator also directs the Court's attention to videos posted by consumers on YouTube.com that depict its product.  Pl.'s Reply at 7.  Predator notes that "[s]ome even mention the 'red' tip." *Id.*  Discrete mentions of the tip's color, for the reasons discussed in the text above, are insufficient to demonstrate secondary meaning.  And, in any event, the submitted videos contain only two passing mentions of the red tip. Furthermore, the videos, to the extent they distinguish various manufacturers' pellets, focus on their relative performance and not their appearance. *See* Pl.'s Reply ex. 19.

product that customers like for its appearance is "competition, not bad faith, provided there is no intention to confuse"); 1 *McCarthy on Trademarks* § 8:1 ("[T]he elements making up the alleged trade dress must have been *used* in such a manner as to denote product source.  Thus, a product feature whose only impact is decorative and aesthetic, with no source-identifying role, cannot be given exclusive rights under trade dress law.") (footnote omitted).  Here, Gamo appears to have been trying to "capitalize on a nonprotected design because of the design's 'intrinsic consumer-desirability' as opposed to any secondary meaning it may have."  2 *McCarthy on Trademarks* § 15:38 (footnote omitted).[20]  In short, consumer comments about the "look" of the POLYMAG are "an indicator of something about the product itself," i.e., its aesthetic strength, and not "an indicator of its source or brand."  *Vornado Air Circulation Sys. v. Duracraft Corp.*, 58 F.3d 1498, 1502 (10th Cir. 1995).  Furthermore, it is not clear whether these comments stem from the red color of the tip or from the overall effect of the colored tip joined with the shape of the pellet. *See Olay Co., Inc. v. Cococare Products, Inc.*, 218 U.S.P.Q. 1028, 1045 (S.D.N.Y.1983), *aff'd mem.*, 742 F.2d 1439 (2d Cir. 1983) ("Olay's use of pink has not acquired a secondary meaning apart from the combination of pink with the other features of Olay's trade dress. Thus, Olay has no protectable interest in the color pink alone.")

---

[20]At the July 22, 2009 hearing, Mr. John Arthur Schild, Senior Vice President of Sales and Marketing at Gamo, testified, in response to a question by plaintiff's counsel regarding whether the look of an airgun pellet matters, that he believed it does "[b]ecause people like cool stuff, they like neat stuff.  They like stuff that looks fast. They like stuff that looks powerful." *Cf.* Pl.'s Reply at 8 n.12 (noting that initially the .177 pellets were black and the .22 caliber pellets were red but that "[c]ustomer feedback indicated that customers liked the color red").

22

Predator also relies on affidavits from three "airgun enthusiasts and consumers of the POLYMAG" to support its contention that the red tip has achieved distinctiveness through secondary meaning.  Pl.'s Mot. and Br. at 17.  One enthusiast stated that the "Polymag red-colored tip stands out from far away and practically 'screams' Predator." Pl.'s Mot. ex 19 ("Gallent Aff.") ¶ 2.   Another asserted that the "POLYMAG's red-colored tip stands out from the crowd and distinguishes it from all other airgun pellets on the market."  Pl.'s Mot. ex. 18 ("Gilliand Aff.") ¶ 2 ("I definitely associate the red-colored tip with Predator").  The third affiant, upon seeing an advertisement for Red Fire pellets, thought Gamo "must have become a distributor of the Predator Pellet."  Pl.'s Mot. ex. 17 ("Zawisza Aff.") ¶ 2.  While this evidence establishes that these three customers associate the red tip with Predator, it does not establish that all of them or that others see the "primary significance" of the red tips as identifying the source of the product. *See Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n.11 (1982); *Vornado*, 58 F.3d at 1502 n.7 (noting that "mere association" between a design and a source is not sufficient to establish secondary meaning); *Durango Herald, Inc. v. Riddle*, 719 F. Supp. 941, 949 (D. Colo. 1988) ("In the minds of the public, the primary significance of the directory's appearance is to identify it as the best source of telephone listings within the relevant market."). *Cf. Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1219 (10th Cir. 2004) ("[W]e conclude the opinions of two people, both of whom regularly attend Rockies' games because of their jobs, are insufficient to establish the majority of the public (whether viewed locally, regionally, or nationally) has come to associate the term 'beerman' with Donchez's character."); 2 *McCarthy on*

23

*Trademarks* § 15:41 ("Some courts have indicated a skepticism as to the value of testimony by random buyers.").

With that said, that certain individuals may associate the red tip with the POLYMAG pellet may demonstrate that a certain minimum quantum of secondary meaning has been achieved.[21]  But "'[s]econdary meaning' does not denote a scale of measurement like 'degrees Celsius,' 'miles per hour,' or 'grams.'  Rather, 'secondary meaning' is a place on a scale of recognition – a particular amount of trademark strength."  2 *McCarthy on Trademarks* § 15:1.  A product's secondary meaning must reach the point where its "primary significance" is source identification.[22]  *Cf. J.M. Huber Corp. v. Lowery Wellheads, Inc.*, 778 F.2d 1467, 1470 (10th Cir. 1985) (concluding that, despite selling $45 million worth of their products over 34 years, spending $500,000 in advertising, and offering testimony that 35 percent of one distributor's customers referred to the feature at issue when purchasing the product, secondary meaning had not been established).  On this record, Predator has not shown that red has such a primary significance here.

---

[21] *See Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1468 (D. Kan. 1996) ("Secondary meaning requires proof that a significant or substantial part of the buying class uses the trade dress to identify a single source.  No set percentage defines significant or substantial.") (citation omitted).  The present record supports a finding that only a minimal part of the relevant consumers use the red tip to identify the POLYMAG pellet.

[22] Another way to put it, as the court in *Aloe Creme Labs., Inc. v. Milsan, Inc.*, 423 F.2d 845 (5th Cir. 1970) did, is that "a secondary meaning entitled to protection must have become the primary meaning to the consumer." *Id.* at 848 n.9 ("The problem may be avoided by thinking of the terms merely as temporal designations." (citation omitted)).

2.   *Likelihood of Confusion*

Before delving into the analysis of this second trade dress requirement, "[i]t must be recognized that secondary meaning and likelihood of buyer confusion, although two separate legal issues, will be difficult to distinguish in viewing the evidence." 2 *McCarthy on Trademarks* § 15:11.  Therefore, despite Predator's failure to establish secondary meaning through its proffered evidence on that requirement, I will resolve the likelihood of confusion arguments based on the preliminary injunction record before me.  I conclude, upon review of that record, that Predator has also failed to establish a likelihood of confusion regarding the source of the products.

"[T]he relevant inquiry is 'whether there is a likelihood of confusion resulting from the total image and impression created by the defendant's product or package on the eye and mind of an ordinary purchaser.'" *Sally Beauty*, 304 F.3d at 979 (quoting *McCarthy on Trademarks* § 8:15).[23]  The Tenth Circuit instructs courts to "consider a variety of factors, including: (1) the degree of similarity between the products; (2) the intent of the alleged infringer in designing its product; (3) evidence of actual confusion; (4) similarity in how the products are marketed; (5) the degree of care likely to be exercised by purchasers; and (6) the strength of the trade dress."  *General Motors*, 500 F.3d at 1227 (citing *Sally Beauty*, 304 F.3d at 972, 979).[24]  To be actionable, confusion

_____

[23]Plaintiff has directed our attention to the redness of the polymer tip as the relevant focus of its trade dress, as discussed above.

[24]It is worth nothing that the "factors underlying a likelihood of confusion analysis in a trademark infringement claim apply equally to trade dress infringement claims." *Sally Beauty*, 304 F.3d at 979.

need not be at the point of sale.  *See General Motors*, 500 F.3d at 1227 ("Recognizing that the Lanham Act was intended to protect the market as a whole from confusion as to the source of a product, we . . . hold that the likelihood of post-sale confusion is relevant to the trade dress infringement inquiry.")  "The party alleging infringement has the burden of proving likelihood of confusion."  *Utah Lighthouse Ministry v. Found. for Apologetic Information and Research*, 527 F.3d 1045, 1055 (10th Cir. 2008).

Here, when "[v]iewing the parties' trade dresses singly" and outside their respective packaging "an ordinary consumer would be struck by the high degree of similarity between them."  *Sally Beauty*, 304 F.3d at 979.  Looking only at the trade dress as defined by Predator, i.e., the red tip, they are quite similar.  Ex. 37 to Pl.'s Mot. and Br. (pellet samples).  The tips are of similar size, shape, color and weight.[25]  Gamo argues that the colors of the respective tips are not precisely the same tone.  That is true, though unavailing.  Due to their small size, the tips are difficult to distinguish unless placed side-by-side and magnified.  That they can be distinguished in such a context, however, is irrelevant to the analysis.  "The marks 'must be compared in the light of what occurs in the marketplace, not in the courtroom.'"  *Beer Nuts*, 711 F.2d at 941 (citation omitted); *see Sally Beauty*, 304 F.3d at 972 ("This court must determine whether the allegedly infringing mark will confuse the public when singly presented, rather than when presented side by side with the protected trademark."); *Durango*

---

[25]Gamo denied in the hearing that the pellets are the same weight.  The Red Fire press release and the product packaging indicate that they are the same weight.  Even if those sources are in error and there is a difference in the products' weight, I find that does not render them dissimilar in any way that materially affects the analysis on this factor.

*Herald*, 719 F. Supp. at 949 ("The court should not undertake a side-by-side comparison, but should recognize that a consumer 'necessarily depends upon the mental picture of that which symbolizes origin and ownership of the thing desired.'") (quoting *Beer Nuts*, 711 F.2d at 941).  If our gaze expands to include the entirety of each pellet, singly presented, the overall look remains strikingly similar.

By examining how the pellets appear to consumers in the marketplace, the respective packaging of the products becomes relevant to the analysis.  When addressing whether singly presented products are likely to confuse consumers "similarities are weighed more heavily than differences, particularly when the competing marks are used in virtually identical products packaged in a similar manner." *Sally Beauty*, 304 F.3d at 972.  Here, however, the "virtually identical products" are not "packaged in a similar manner."  Rather, Predator packages its POLYMAG pellets in a round metal tin with a black, white, and red label, which has a depiction of the red tipped pellet, with black taking up about three quarters of the label's surface.   Def.'s Hr'g exs. A-34,A-35.  On the other hand, Gamo's Red Fire packaging includes a tin, which is not the same size as Predator's, with a clear plastic top which allows the pellets, with their red tips, to be viewed.   *Id.* ex. A-31.  The tin is housed within a plastic and cardboard package, the cardboard containing the Red Fire and Gamo names. Def.'s Response, ex. B.  The front of the cardboard packaging is also predominately black, with red and white lettering, along with a depiction of the pellet, and the back includes virtually the same language Predator used to describe its product on its website and in its brochures. *Id.*  That a consumer can see the image of the POLYMAG

and view into the Red Fire tin does permit comparison of the pellets themselves.  The packaging, however, clearly indicates the source of each product and distinguishes them in overall appearance.[26]  In light of the similarity evidence pulling in both directions, I turn to the next factor: Gamo's intent.

As I found above when addressing secondary meaning, Gamo copied POLYMAG's red tip.  Predator contends that the court must, therefore, apply a presumption that there will be a likelihood of confusion.  There are cases which state that an "inference" is raised by proof of copying.  *See, e.g.*, *General Motors*, 500 F.3d at 1228 (quoting *Beer Nuts*, 711 F.2d at 941) ("Proof of intentional copying 'raises an inference of likelihood of confusion.'");  *Sally Beauty*, 304 F.3d at 973 ("Proof that a defendant chose a mark with the intent of copying the plaintiff's mark may, standing alone, justify an inference of likelihood of confusion.") (citing *Beer Nuts*, 711 F.2d at 941); *Beer Nuts*, 711 F.2d at 941("'Intent on the part of the alleged infringer to pass off

_____

[26]Predator cites Gamo's use of Predator's copyrighted language on its packaging as further evidence going to likelihood of confusion.  While one affiant has claimed that added to the confusion, the court finds that there is insufficient evidence to find that the products, when singly presented, would be confused, at least in part, because consumers would recall specific language describing the other.  In other words, Predator has not demonstrated that an ordinary consumer's "mental picture," *Beer Nuts*, 711 F.2d at 941, will include specific, and relatively extensive, language.  Furthermore, the language does not appear on the POLYMAG packaging.  Finally, that the language might spark confusion does not necessarily aid Predator in its contention that the red tip on the Red Fire is the source of confusion.  If the confusion is caused by a combination of the language, the similar shape, and the color, it is not clear that there is a basis to claim that the red itself is the source of identification and confusion.
      Predator also stresses that post-sale confusion is relevant to the analysis.  That is true. *See General Motors*, 500 F.3d at 1227.  Here, however, Predator has provided no evidence that consumers, other than those who viewed the items at the point of sale, interact or view the products post-sale in contexts where the source of the product is unclear.

its goods as the product of another raises an inference of likelihood of confusion . . . .'")

(quoting *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)); *Marker Int'l v.*

*DeBruler*, 844 F.2d 763, 764 (10th Cir. 1988).

It is on this point, the inference to be drawn from the intent to copy, where much

of the overlap between secondary meaning and likelihood of confusion occurs.[27]   As

noted above, the intent behind the copying is relevant when addressing secondary

meaning.  *See Winning Ways*, 913 F. Supp. at 1473-74 (stating that, for purposes of

secondary meaning analysis, the "intent of the copying party is relevant . . . in order to

determine whether another valid motivation for copying the trade dress exists.").

Without such an indication of the motivation, an otherwise permissible – and potentially

desirable – copying by competitors might be too quickly prohibited by an overly

expansive application of trade dress protection.  "It must . . . not be forgotten that there

is absolutely nothing legally or morally reprehensible about exact copying of things in

the public domain.  For example, evidence that a junior user exactly copied unprotected

descriptive, generic or functional public domain words or shapes does not prove any

legal or moral wrong(s)."  2 *McCarthy on Trademarks* § 15:38 (footnotes omitted); *see*

---

[27]*See, e.g.*, *Marker Int'l*, 844 F.2d at 764 (citations omitted):
Defendant deBruler stated that he continued to use the Marker name
and sloping "M" logo because Marker had a reputation for quality
products and he believed people might associate that reputation with the
Marker Surf America products. These statements by the defendant
constitute an admission that the Marker International trademark has
secondary meaning. Although the district judge did not directly address
the secondary meaning question, he addressed the same factual issue
in his analysis of the likelihood of confusion question. The district judge
made clear in his thorough opinion that this admission contributed to his
conclusion that a trademark infringement had occurred.

*Duraco Prods. v. Joy Plastic Enters.*, 40 F.3d 1431, 1453 (3d Cir. 1994) ("[T]he copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse customers as to the source of the product.").

But, as at least one court has noted, "[l]ikelihood of confusion . . . is examined from the perspective of the purchaser," who is "unlikely to know the copying party's intent." *Winning Ways*, 913 F. Supp. at 1474. Here, there is some risk of confusion in light of the similarities between the products' red tips. By reference to other factors relevant to the likelihood of confusion analysis, however, I conclude that the risk is largely mitigated.

One way to determine such risk is by reference to actual confusion. A common, though not required, way to establish actual confusion is by conducting customer surveys. *See Sally Beauty*, 304 F.3d at 979 ("Beautyco's survey is strong evidence of actual confusion between Sally Beauty's and Beautyco's trade dresses."); *Owens-Corning*, 774 F.2d at 1127 ("[T]he record contains consumer survey evidence."). Here, Predator has not conducted a customer survey, but has been able to present the court with consumer comments made directly to Predator as well as online. As outlined above, customers have wondered, in light of the product similarities, whether Gamo acquired Predator or had been licensed to sell POLYMAG pellets. This evidence, despite Gamo's contentions, does indicate that there has been some confusion in the marketplace. It appears, however, to be of a very limited nature.[28] *See Sally Beauty*,

---

[28]Indeed, some of it emphasizes a lack of confusion, either as a result of recognition of the distinctions or clarification after inquiry. Moreover, the evidence Predator presents does not indicate whether anybody has remained confused up to a

304 F.3d at 974 ("Evidence of actual confusion does not create a genuine issue of fact regarding likelihood of confusion if it is *de minimis*.").   I do not suggest that there might not be others who were and remain confused, but there is not significant evidence of that in the record before me.[29]   Therefore, while I conclude that some consumers may have been initially confused about the two products, thus sparking inquiry, there is insufficient evidence to find that a significant number of ordinary consumers are purchasing Gamo's product believing it to be Predator's because of the red tip.[30]   Nevertheless, I recognize "that the 'absence of [actual confusion] does *not* necessarily

---

point of sale, i.e., has purchased one product believing it to be the other.  Indeed, the record indicates that those who Predator knows to have been confused have had their confusion resolved. *Cf.* Pl.'s Mot. ex. 18 ("Gilliand Aff.") ¶ 3 ("Predator informed me that it had not licensed Gamo to sell the Red Fire and that there was no association between the two products or the companies."); ex. 16 (where a customer's speculation that Red Fire pellets were Predator products received a response contradicting that speculation).  That is not to say, of course, that there may not be customers buying Red Fire pellets believing them to be POLYMAG pellets who have not had the difference clarified.

[29]*Cf. Vornado*, 58 F.3d at 1509 (commenting that while it does not "doubt that at least some consumers are likely to ignore product labels, names, and packaging and look only to the design of product features to tell one brand from another" and thereby "are likely to be confused", the "Lanham Act . . . has never provided absolute protection against all consumer confusion as to source or sponsorship").

[30]*Cf.* 1 *McCarthy on Trademarks* § 8:15 ("The Seventh Circuit has emphasized that when trade dress is claimed to exist in a commonplace design which may well be viewed by consumers as mere decoration, proof of a likelihood of confusion may require more in the way of evidence than a mere hypothetical argument that it is the product design which will confuse consumers. The court reversed a $1.2 million verdict for a plaintiff who claimed trade dress in a broom bristle color scheme because it failed to introduce evidence that consumers were likely to confuse the sources *because of* the broom colors: likelihood of confusion cannot be based on "pure conjecture or a fetching narrative.") (citing *Libman Co. v. Vining Indus.*, 69 F.3d 1360 (7th Cir. 1995), *cert. denied*, 517 U.S. 1234, 135 L. Ed. 2d 173, 116 S. Ct. 1878 (1996)*; Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376 (7th Cir. 1996)).

support a finding of *no* likelihood of confusion, especially when the products involved are inexpensive.'" *Sally Beauty*, 304 F.3d at 974 (citation omitted) (emphasis in original).

I now briefly turn to the marketing of the respective products.  As already noted, the packaging and names of each pellet are different.  However, Gamo has co-opted language from Predator to describe and market its products.[31]  There is also evidence in the record that the pellets are both sold in sporting good stores and online.  As the Tenth Circuit stated in *Beer Nuts*, the "possibility of confusion is greatest when products reach the public by the same retail outlets." 711 F.2d at 941.  Furthermore, the pellets, when sold online, are sometimes depicted without their packaging.  Pl.'s Mot. ex. 10.  Based on this evidence, I find that the products are sold and marketed in sufficiently similar manner to weigh this likelihood of confusion factor in favor of Predator.  *See Sally Beauty*, 304 F.3d at 974 ("In analyzing the similarity in the manner of marketing, this court has previously considered whether the parties were competitors in consumer markets."); *id.* at 975 ("None of our cases, however, require that the allegedly infringing product be available on the same shelves as the plaintiff's product.").

Any effect in the similarity in marketing, however, can be undercut not only by differences in packaging, *see supra*, but also by the degree of care customers apply to their purchasing decisions.  The more care a consumer takes when purchasing the

---

[31]Gamo has removed the text from its website.  Although the parties have reached a stipulation on the copyright issue, there are indications that Red Fire pellets in packaging containing Predator language still appear in and are being shipped to stores. Pl.'s Mot. for Contempt [Docket No. 64].

product, the less likely there is to be confusion. *Id.*, 304 F.3d at 975 (""The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase."). "Buyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse. Despite a lower degree of similarity, these items are more likely to be confused than expensive items which are chosen carefully." *Beer Nuts*, 711 F.2d at 941.

Plaintiff contends the degree of care here is low.  However, it also asserts that the airgun pellet market is a niche one in which Predator sells a distinctive product recognized for its quality.[32]  Many of the same consumers who blog and post reviews about Polymag pellets are knowledgeable about the differences.  These comments might highlight similarities between the products, but they also show that consumers are making fine distinctions and are exercising care.  In short, the evidence indicates that purchasers of airgun pellets buy with greater care than one might normally presume would be the case for an inexpensive item. *Cf. Utah Lighthouse Ministry*, 527 F.3d at 1056 (finding that despite the low cost of the books at issue, "one could . . . infer that potential customers . . . are discerning and sophisticated about where they purchase books on controversial religious subjects").   It is a specialized market, as Predator emphasizes, and the product is used with more expensive air rifles.  This case is, in that way, unlike generic shampoo, *see Sally Beauty*, 304 F.3d at 975 ("[I]tems

---

[32]I am persuaded by Predator's argument that the relevant group here is "consumers in the airgun industry," Pl.'s Reply at 4, and does not include, as Gamo would have it, those in the market for other forms of ammunition.  Nevertheless, as explained above, Predator has failed to establish secondary meaning for POLYMAG's red tips in that market.

purchased on impulse are more likely to be confused than expensive items, which are typically chosen carefully."), snacks, *see Beer Nuts*, 711 F.2d at 941 ("Buyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse."), or greeting cards, *see Hartford House*, 647 F. Supp. at 1544 ("Clearly non-occasion greeting cards are relatively inexpensive items that may be purchased on impulse."). With that said, the level of care is still unlikely to approach that taken when purchasing, for example, an expensive automobile. *See General Motors*, 500 F.3d at 1228 (finding that the district court "properly considered the relevant factors for likelihood of confusion," including its conclusion that "[g]iven the high price of the Hummer, . . . purchasers would exercise sufficient care" to avoid confusion).

Finally, I turn to the alleged trade dress's strength. *Sally Beauty*, 304 F.3d at 975 ("The stronger the mark, the greater the likelihood that encroachment on the mark will cause confusion."). "Trademark strength is measured by its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *Beer Nuts*, 711 F.2d at 939. As I concluded above, Predator has not provided evidence demonstrating that the color of the POLYMAG tips has achieved distinctiveness through secondary meaning. Therefore, this factor weighs decidedly in Gamo's favor.

Having weighed all the relevant factors, I conclude that Predator has not demonstrated a likelihood of confusion on account of the "redness" of the POLYMAG's tips. In fact, much of Predator's proffered evidence belies a claim that it is the color of the tip that is the source of any confusion (or, it should be reemphasized, of the

identification of its product).  If the pellet and tip of each product were of a substantially different shape and size, there is little to indicate that the "red tips" on the Red Fire alone would likely confuse consumers.

### 3.  Functionality

Despite having found that Predator has failed to meet the first two requirements of a trade dress claim at this preliminary stage, I briefly address the third trade dress requirement.  "Whether the feature is functional should turn on 'whether the protection of the [feature] would hinder competition or impinge upon the rights of others to compete effectively in the sale of goods.'" *Hartford House*, 846 F.2d at 1272.  As the Tenth Circuit has commented, the "availability of equally satisfactory alternatives for a particular feature, and not its inherent usefulness, is often the fulcrum on which Lanham Act functionality analysis turns."  *Vornado*, 58 F.3d at 1507.  The analysis is conducted "in terms of competitive need."  *Id.*; *see Brunswick Corporation v. British Seagull Limited*, 35 F.3d 1527, 1533 (Fed. Cir. 1994) (stating, in a case regarding the functionality of the color black on outboard motors, that the "test for de jure functionality hinges on whether registration of a feature hinders competition, and not whether the feature contributes to the product's commercial success").

Here, alternative colors have been used.  Predator initially produced its own product with a black tip, and Gamo had a certain number of its pellets made in alternative colors.  Nevertheless, Gamo contends that the color red serves a functional purpose, creating an association with aggression and the hunting industry.  First, I do not find that claim to be a credible explanation for its choice in this instance.  *Cf.*

*Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1486 ("The district court found the appellee's explanation for their adoption of the Lardashe mark not credible.")

There is nothing in the record to support a finding that the red color of the tip is functional. *See Durango Herald*, 719 F. Supp. at 950 ("Protection of one of the several color combinations available to Riddle, and particularly the red cover to which significant good will attaches, does not hinder competition or remove a valuable qualitative feature from Riddle's product.").[33]  It is clear that "alternative designs or presentations of the product can be developed" without hindering Gamo's ability to compete. *Id.* at 950; *see Owens-Corning*, 774 F.2d at 1121.  This is, in short, unlike having an outboard motor be black to make it look smaller, *see Brunswick*, 35 F.3d at 1532, or farm equipment be green so it all matches, *see Deere & Co. v. Farmhand, Inc.*, 560 F. Supp. 85, 91 (S.D. Iowa 1982), *aff'd*, 721 F.2d 253 (8th Cir. 1983). Nevertheless, because Predator has not met the first two requirements, it is not entitled to the extraordinary remedy of a preliminary injunction.

### C.  The Remaining Preliminary Injunction Requirement

Predator has not shown a likelihood of success on the merits or met the modified standard available under certain circumstances in the Tenth Circuit.  Therefore, its arguments on the remaining preliminary injunction elements are unavailing.  Although

---

[33]Mr. Schild, a senior vice president of sales and marketing at Gamo, affirmed at the July 22, 2009 hearing that Red Fire pellets would "function the same if the tip were blue."

"[g]ood will necessarily travels with the mark,"[34] *Durango Herald, Inc. v. Riddle*, 719 F.

Supp. 941, 945 (D. Colo. 1988), there is, of course, no irreparable harm cognizable by

law if there has been no infringement.  Even if, for the purpose of argument, I were to

presume such irreparable injury here, the presumption would be weak.  *Cf. Vornado*, 58

F.3d at 1509 ("The degree to which a producer's goodwill will be harmed by the copying

of product configurations correlates with the degree of customer confusion as to source

or sponsorship that is likely to result from the copying.").  Showing that Gamo is

capitalizing on the popularity of the red tip is not a basis to find irreparable harm, absent

consumer confusion.[35]  *See General Motors*, 500 F.3d at 1229-30 ("Although

'infringement alone can constitute irreparable injury and . . . the movant is not required

to show that it lost sales,' in the present case, GM made an insufficient showing with

respect to infringement.  Thus the district court was not obligated to find irreparable

injury to GM and could conclude that 'monetary compensation may well be ample and

sufficient in the event that GM ultimately prevails.'").

　　　As for the balance of the equities, Predator cites *General Motors*, 500 F.3d at

---

[34]Predator argues that irreparable injury is presumed in trademark infringement actions.  Pl.'s Mot. at 24.  *See Hartford House*, 647 F. Supp. at 1545 ("In trade dress actions, likelihood of consumer confusion establishes both the requisite probability of prevailing on the merits and the risk of irreparable harm.") (collecting cases).  Predator does recognize that *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), a patent case, may call into question a presumption that automatically flows from a finding of infringement.

[35]*Cf. Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 913 F. Supp. 1454, 1462 (D. Kan. 1996) (noting that "in product configuration cases, a court must 'distinguish between goodwill toward the producer – all that trade dress law protects – and goodwill toward the article – "the attractive features, of whatever nature, that the product holds for consumers" – which is freely appropriable by second comers'") (citations omitted).

1229, where the court stated that "when the case for infringement is clear, a defendant cannot avoid a preliminary injunction by claiming harm to a business built upon that infringement."  That reasoning is irrelevant here, however, because "[w]here a movant has failed to make a strong case for infringement, it is not entitled to consideration of whether the nonmovant has brought the harm upon itself."  *Id.* at 1229.  While it is true that Predator is a much smaller company than Gamo, and the POLYMAG provides it with the lion's share of its revenue, that does not, on its own, warrant a finding that the equities necessarily tip in its favor.  *See id.* ("Because the district court found GM's showing on the merits to be insufficient, it properly considered the financial hardship to Urban Gorilla that would result from a preliminary injunction.").

Finally, the public interest cautions against issuing a preliminary injunction on the present record.  *Cf. Winter*, 129 S.Ct. at 376 -377 ("'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'") (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  As has been referenced above, copying is not prohibited in the absence of evidence of likely confusion, as copying often stems from motivations wholly consistent with competition. *See TrafFix*, 532 U.S. at 29 ("Allowing competitors to copy will have salutary effects in many instances.").  In other words, in the absence of trade dress infringement, where customers are harmed by confusion, competitors may  copy those features consumers most want to have in their products.[36]  "Legally protected

---

[36]*Cf. Wal-Mart*, 529 U.S. at 213 ("The fact that product design almost invariably serves purposes other than source identification not only renders inherent distinctiveness problematic; it also renders application of an inherent-distinctiveness principle more harmful to other consumer interests. Consumers should not be deprived

zones of exclusive rights, such as trade dress, are exceptions to the general principle of free copying and competitive imitation. Thus, those who seek exclusivity for trade dress, especially trade dress in product shapes, must make a clear showing of validity and infringement." 1 *McCarthy on Trademarks* § 8:1 (footnotes omitted).[37]  This is particularly true where, as here, Predator has staked its trade dress claim to color. Predator has failed to make such a showing.

## III.  CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction on its trade dress claim is hereby DENIED.[38]

DATED October 22, 2009.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

---

of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness.").

[37]*Cf. Vornado*, 58 F.3d at 1504 ("When asked to balance the concerns of patent law against those of unfair competition law with respect to the copying of product shapes, the Supreme Court has ruled repeatedly over the years that the right to copy must prevail.") (citations omitted).

[38]The parties' stipulation regarding a preliminary injunction on Predator's copyright claim will be addressed by separate order.